## SALLY MILLER v. LOUIS BELMONTI.

Persons of color are presumed to be free. *Per Curiam :* Slavery is an exception to the condition of the great mass of mankind, and, except as to Africans in the slaveholding States, the presumption is in favor of freedom, and the burden proof is on him who claims the colored person as a slave.

APPEAL from the District Court of the First District, *Buchanan,* J.

BULLARD, J. The plaintiff sues for her freedom, on the ground that she was born free, and of European parentage. She asserts that her father was Daniel Miller, and her mother Dorothea Miller ; that they emigrated from Germany in 1817 or 1818, with herself, and two other children ; that her mother died upon the passage, and her father soon after their arrival. She sets forth in her petition many things connected with her biography, and that of her father, which are unsupported by evidence, and which we regard as wholly immaterial to the great question which the pleadings present, to wit, whether the plaintiff be white and free, or a slave—*libera, vel non.*

The original defendant, Belmonti, asserts that she is his slave, purchased by him from John Fitz Miller, whom he calls in as warrantor.

The warrantor pleads that, in August, 1822, one Anthony Williams, then of Mobile, left with him a certain mulatto girl, then named Bridget, and about twelve years old, whom he claimed as his slave, and represented to be a mulattress and slave for life. That having made an advance of one hundred dollars, to be reimbursed on the sale of said girl, he afterwards sold her to his mother, Mrs. Canby, by whom she was raised as a domestic, and who retained her until 1834, when she, with her children, were sold back to him ; and afterwards, in 1838, were by him sold to Belmonti, the defendant. He avers that the same Bridget is now plaintiff in this case, suing by the name of Sally Miller ; that he never knew of her until she was left with him for sale, in 1822 ; that he believed, and still does believe her to be a mulattress, of African descent, and a slave for life. That he is entirely ignorant of all the allegations in the petition. He sets forth other matters touching his liability as warrantor, which it is not necessary to repeat.

The District Court, not being satisfied that the plaintiff had shown herself entitled to her freedom, dismissed her petition, and she appealed.

The first enquiry which engages our attention is, what is the color of the plaintiff? In questions of this kind much weight is given to that consideration. Ever since the case of *Adelle* v. *Beauregard*, in the Superior Court, as early as 1810, it has been the settled doctrine here, that persons of color are presumed to be free. Slavery itself is an exception to the condition of the great mass of mankind, and, except as to Africans in the slave-holding States, the presumption is in favor of freedom, and the burden of proof is upon him who claims the colored person as a slave. In that case, the court remarked : " Persons of color may have descended from Indians on both sides, from a white parent, or mulatto parent, in possession of their freedom. Considering how much probability there is in favor of the liberty of these persons, they ought not to be deprived of it upon mere presumptions, more especially as the right of holding them in slavery, if it exists, is, in most instances, capable of being satisfactorily proved." 1 Mart. 183.

The same principle was recognised in the cases of *The State* v· *Cecil* (2 Mart. 208), and *Pilié* v. *Lallande et al.* (7 Ib. N. S. 649)·

Nor is it peculiar to our jurisprudence. In the highest court of the State of Virginia, it is a well settled rule of law; and a person of the complexion of the plaintiff, without evidence of descent from a slave mother, would be released even on a *habeas corpus.* 1 Henning and Munford, 134.

The proof in the record of the complexion of the plaintiff is very strong. Not only is there no evidence of her having descended from a slave mother, or even a mother of the African race; but no witness has ventured a positive opinion, from inspection, that she is of that race. She is evidently a *brunette,* but Gen. Lewis, one of the most intelligent and candid witnesses on the part of the defendant, who had known her long, says she is as white as most persons; but that he has seen slaves as bright as the plaintiff. He adds, that he always thought she had something resembling the colored race in her features, but this opinion may have been induced by the fact, that he had always seen her associating with persons of color. He also testifies to her resemblance to another female then in open court, shown to be a German, and a kinswoman of the lost daughter of Daniel Miller.

Being satisfied that the presumption is clearly in favor of the the plaintiff, it is next proper to enquire, how far that presumption has been weakened, or fortified, or repelled by the testimony, of numerous witnesses, in the record.

If a number of witnesses had sworn, that the plaintiff is, in their opinion, the daughter of a particular colored person, who was in fact a slave, or reputed such, and an equal number of witnesses had testified to their belief, that she is identical with a child who arrived here, with her family from Germany, more than a quarter of a century ago, so far as her age and other particulars could be ascertained after that lapse of time, and judging from color and family resemblance, we might hesitate in coming to a conclusion as to who the plaintiff is—whether she be, in fact, the child so long lost sight of, or a slave. But such is not the case here. Those who maintain the hypothesis of her slavery throw no light upon her origin, or her birth. She is first known in the condition of a slave, at the age of nine or ten years, separated from her mother, left for sale by a stranger by the name of Williams, who has not since been heard of, and first

sale as such, for ought that appears in the record, by the defend-
ant's warrantor, acting as the agent of Williams.   Her own
statements on the subject, so far as they are of any value, while
they show that she did not seek this controversy, and was appa-
rently contented with her condition, make no allusion to her
parentage, unless it be to the Indian race ; and when she allud-
ed to the fact of having come over the lake, or of being sold by
a negro trader, it is impossible to say whether she alludes faintly,
as a dim reminiscence, to her voyage over the Atlantic, or to her
being brought here from Mobile.   On the contrary, those who
maintain the proposition that the plaintiff is the person she as-
sumes to be, and is free, have something more positive and
certain.   It is shown, beyond all controversy, that a child, bear-
ing that name, and about the same age, arrived here from
Germany, in 1818, with her father, a brother and a sister ; that
her mother died at sea—her father and brother not long af-
ter their arrival ; and that the two daughters disappeared ; that
after a lapse of more than twenty years, the plaintiff was dis-
covered by a woman by the name of Carl, who died before the
trial, and was recognised by her relatives as the same lost child.
Numerous witnesses swore positively to their undoubting con-
viction of her identity.   But the proof does not stop at mere
family resemblances and recognitions.   It is shown by evidence
which is not impeached, that the lost child had certain natural
marks, or moles, on the inside of her thighs.   The plaintiff was
examined by eminent members of the medical profession, who
certify to the existence of precisely such congenital marks
upon her person, and that it is impossible they could be produc-
ed by any known means.

  But the principle which the court adopted in the case of *Adelle*
v. *Beauregard,* is combatted in the briefs of the counsel for the
appellees, who contend that it is inapplicable to such a case as
this ; and they urge upon us the doctrine of the Spanish law as
found in the 3d Partida, 14th title, 5th law, which declares,
that " when the plaintiff in a case alleges, that he is free, and
brings a suit for his freedom against his master, who holds him
in his power and claims him as his slave, and the master pro-
duces any title, document, or other proof, to show that he had

possession of the plaintiff, in good faith, and not by force or fraud, it will be incumbent on the plaintiff to prove that he is free, or that the master has taken possession of him by force or fraud; for if he can prove neither, he ought to remain a slave in the power of his master, as the latter had shown a just title to the possession of him."

Such a principle may have been thought reasonable in Spain, where it is believed slavery was not confined to the negro race, and where, consequently, the distinction of color was of less importance than with us; but even there, it is not so clear, that the fair and florid complexion of the natives of the north of Spain, would not weigh as a presumption in favor of liberty, in the absence of all proof of birth from a slave mother, and especially when the title of the master orignated, as has been shown in this case. Williams authorises the sale of a child apparently white, at a time when the law forbade the sale even of a slave child, separately from her mother, under the age of ten years, and thus imposed upon Miller, who, it is to be presumed, acted in good faith, and in relation to whom, we are bound to say, that the allegations in the petition tending to his prejudice, are wholly unsupported; and if we could adopt the views of the counsel, and were convinced that the proof of all those allegations was essential to the recovery of the plaintiff, we should pronounce against her. But, we repeat, that, in our opinion, they are wholly immaterial, and that the only question is, whether the plaintiff was born free. Upon that point, even if the presumption were against her, she has gone far to prove that she is the identical child of Daniel Miller. It has been said that the German witnesses are imaginative and enthusiastic, and that their confidence ought to be distrusted. That kind of enthusiasm is, at least, of a quiet sort, evidently the result of profound conviction, and certainly free from any taint of worldly interest, and is by no means incompatable with the most perfect conscientiousness. If they are mistaken as to the identity of the plaintiff; if there be in truth two persons about the same age, bearing a strong resemblance to the family of Miller, and having the same identical marks from their birth, and the plaintiff is not the real lost child, who arrived here with hundreds of

others in 1818, it is certainly one of the most extraordinary things in history. If she be not, then nobody has told who she is.

After the most mature consideration of the case, we are of opinion that the plaintiff is free, and it is our duty to declare her to be so.

It is, therefore, adjudged and decreed, that the judgment of the District Court be reversed; and ours is, that the plaintiff be released from the bonds of slavery, that the defendant pay the costs of the appeal, and that the case be remanded for further proceedings, as between the defendant and his warrantor.*

*F. H.* and *W. S. Upton*, and *Roselius*, for the appellant.

*Micou, Canon*, and *Grymes*, for the defendant and warrantor.

---

* *Micou* and *Canon*, for a re-hearing. The opinion of the court in this case has extended the force of a mere presumption far beyond the limit of any prior decision. The general rule of law is that the plaintiff must prove his case. The 3d Partida, tit. 14, law 5, creates an exception.

In suits for freedom, the mere possession and claim of the master, was not considered presumptive proof, throwing the *onus probandi* on the plaintiff; but if "the master produce any title, document or other proof, to show that he had possession in good faith, and not by force or fraud, *it will then be incumbent on the plaintiff to prove that he is free*," &c. 1 Moreau and Carleton's Translation, p. 177.

In the case of *Adelle* v. *Beauregard*, 1 Martin 183, the court was called upon to decide, upon which party the *onus* lay. The plaintiff relied upon the law of the Partida, already quoted, and the court decided that as she was a woman of color and not a negro, she was entitled to the benefit of the law, and required the defendant to show his title.

In the case of *Mary* v. *Morris*, 7 La. 139, the court said: "The plaintiff being, from color and possession of defendant, presumed to be a slave, the burthen of proving her freedom, devolved on her."

The principal recognised in these two decisions, restricts, instead of extending, the rule laid down in the Partidas. That rule is in terms applicable to all suits for freedom. The evident inclination of the court is, to restrict it to suits for freedom *in which the plaintiff is a colored person*, and not a negro ; apparently considering the presumption arising from the fact of being a negro, coupled with the possession of the defendant, sufficient to put the plaintiff upon his proof.

Nor do the cases of *Pilié* v. *Lalande*, 7 Martin N. S. 649, and *Hawkins* v. *Vanwickle*, 6 Ib. N. S. 420, conflict with the principle thus established. In one of these cases, the question arose collaterally ; a witness being presented, objection was made that she was a slave. The court decided that, being in the enjoyment

of freedom, she was, *prima facie*, to be considered free ; and this court, on appeal, held the opinion correct, the bill of exceptions not showing that the witness was a negro.

In the other case, the suit being for property claimed by the plaintiff, the defendant pleaded that plaintiff was a slave. The court held that the suit not being one for freedom, but brought by a person in the enjoyment of it, the burthen of proving slavery, was on the party who alleged it.

Before the repeal of the Spanish law, in suits for freedom, the plaintiff, if a colored person, was not put upon his proof, until the defendant had shown good faith.

With this requisition the defendants in this suit have fully complied. They show a possession of twenty three years standing, under written titles, and the strongest presumptive evidence, from the position in society and circumstances of the parties, that they were in good faith. They have therefore fully complied with the law of the third Partida, and with the opinions of the court based upon that law, and have fairly placed the burden of procuring freedom upon the plaintiff.

But the Spanish law has been repealed. The special exception to the rule that the plaintiff must prove, has ceased to exist. The law declares in general terms, and without exception, that the plaintiff must produce his witnesses and evidence in support of his demand, and that the defendant is not called upon until the plaintiff has closed his case. Code of Practice, arts. 476, 477.

This court has since applied this principle to a suit for freedom.

The opinion was pronounced by the present senior judge, who commences by stating that, "the plaintiff is a person of color, and sues her aunt for the purpose of establishing her, and her childrens' claim to freedom." The intervenors were also persons of color, and the plaintiff, though held by them as a slave, claimed to be their relation. The court below having instructed the jury that the intervenors were not bound to show their title, this court said : "On a full consideration of the case, this court is of opinion, that the instruction was correct. A slave cannot stand in judgment for any other purpose than to assert his freedom. He is not even allowed to contest the title of the person holding, or claiming him as a slave." *Berard* v. *Berard*, 9 La. 158.

Whether we consider the law of the Partida in force or not, the *onus* lies upon the plaintiff in this case. If the rule of the Partida is no longer law, then the plaintiff as such must make out her case.

If the rule remain in force, the defendant has shown good faith by adducing his title, proving the payment of a fair price, and calling his vendor in warranty ; thus throwing back upon the plaintiff the burden of proof.

If the court should be of opinion that the warrantor was also obliged to show his title before demanding any proofs from the plaintiff, he has done so, by producing a title, which, beyond doubt, he received in good faith. See also the case of *Seville* v. *Chrétien*, 5 Martin, 275.

*Re-hearing refused.*